Good morning, may it please the court, Nancy Abudu representing the Rubio v. Brewer case, which has been consolidated with Harvey v. Brewer, and pursuant to this court's order, I will be splitting my time with Mr. Cosgrove, therefore I will be addressing the unconstitutionality of Arizona's requirement that legal financial obligations be paid as a prerequisite to one getting their voting rights restored. And I'd like to go ahead and reserve three minutes of rebuttal time now. Now there were several legal errors the district court made below, and of course this court should review those errors de novo, and we rely upon our brief for those arguments. However, there are two issues that I would like to address this morning. The first is the district court's ruling that Arizona's requirement that monetary obligations be paid, which we have been referring to as LFOs, is not an electoral standard. And the second issue is the district court's failure to use the proper test under the Equal Protection Clause with respect to plaintiff's equal protection claim. Now in Harper v. Virginia State Board of Elections, the Supreme Court held unequivocally, and I quote, that a state violates the Equal Protection Clause whenever it makes the affluence of a voter or payment of any fee an electoral standard. In this case, three of the appellants would be automatically eligible for restoration of their voting rights, but for their inability to satisfy their... But in this case, the payment of the money is not in order to vote, it is in order to serve out their sentence. Part of the punishment for their felonies was the payment of fines or restitution. I guess we're treating fines and restitution as being the same, or being... I'm not sure there are any differences here. But that was part of their sentence. This is not something that's set as a requirement for voting, it's a requirement for regaining your civil rights. I don't understand why this is covered by Harper, or anything else. It is a condition of their sentence, and it is a voter qualification. By Arizona enacting an automatic restoration requirement that requires completion of sentence, it has therefore required and set all of the conditions of one's sentence as a voter qualification. Justice, age, residency, completion of prison and parole, and completion of these financial obligations. Therefore, unlike the defendants in the district court, which have tried to pigeonhole us into challenging the constitutionality of the sentence, we don't need to do that. Because by, again, enacting an automatic restoration requirement, the state has made the conditions of a sentence an electoral standard. But until they actually complete the sentence, they're not eligible to vote, right? So it's not the... there's not something imposed on an eligible voter, as in Harper? Well, it is the... But they're not eligible to vote, correct, until they've finished their sentence, including paying the fines and restitution? That is correct, but again, that has now become an electoral standard. It's not... Well, only by your allegation. It certainly wasn't an electoral standard when the court imposed this as part of their sentence, was it? No, it was not. No, and so why can't that be enforced, and then we deal with whether voting can be continued? Because, as in Harper, the plaintiffs in this case would be automatically eligible for their voting rights, but for their inability to satisfy these financial obligations. It was just part of the sentence. I just don't think it's equivalent. You want us to treat it that way, but I don't see how that makes it that way. Because, again, by requiring the completion of a sentence and transferring it from the criminal realm into the civil realm, it has therefore made the conditions of the sentence an electoral standard. And as an electoral standard, it is obligatory that the state satisfy the parameters of the... Let me give you another case to test this very proposition that Justice O'Connor is asking you about. There was a time once when I was not a citizen, and in order to get my citizenship, I had to pay a fee as part of the application process. And until I paid the fee, and of course I had to do some other things. I had to know the names of three Supreme Court justices. Well, I wasn't in high school. Actually, I was just in college at the time, so it wasn't so easy. There was a test and English proficiency and the like, but one of the things I had to do was pay... It was something like $6,000. Was that illegal under Harper? Well, I would say... I had never been eligible to vote before because I was not a citizen. And yet, in order for me to become eligible to vote, I had to become a citizen, which I couldn't do without payment of a filing fee. Well, I would say that based on some of the recent decisions in the photo ID cases, that very well could be. In Common Cause v. Billups, the district court affirmed by the 11th Circuit on this particular issue found that the $20 or the $32 that was a condition for getting the photo ID was equivalent to a poll tax. That's for somebody who is a citizen and has to go get proof. But remember the hypothetical. I am not a citizen, or whoever the person is not a citizen, and so has never been eligible to vote before and can't gain eligibility without gaining citizenship. It's not a question of getting proof. It's a question of actually being admitted to citizenship, raising your hand, swearing the oath, and getting a certificate that you are now a citizen and therefore eligible to vote. So, is that kind of fee legal for somebody who is not eligible, who is not a qualified elector, and has to pay the money in order to become one? If you could not afford whatever that citizenship fee would be, then arguably, yes, it would be. Which is why, even in Harper and other cases, you have to look at the discriminatory nature of the case. I'm not sure what the citizenship application fee is, but in our case, Mr. Coronado, for example, was sentenced to pay almost $3,000 plus interest, which dates back almost two decades. Mr. Garza was sentenced to pay almost $4,000 plus interest. Is that fines or restitution? Fines and restitution. For Mr. Coronado, it was restitution. For Mr. Garza, I believe it was fines and restitution. Isn't this money he took from other people? Well, unfortunately, because we were dismissed on a 12B6, we weren't able to present any evidence, so it's not in the record. But no, it was not. Mr. Garza's crime was a drug distribution crime. There was no victim, as far as we know. And so, under Arizona law, when you're convicted of a drug crime, the court really doesn't have any discretion. It must order certain fines and fees against you. I believe when you're a first-time offender, it's at least $1,000. A two-time offender, at least $2,000. So when you're dealing with a situation where the court has no discretion when it comes to the imposition of fines, and then you make the payment of those fines a voter qualification, hopefully the court can see that there is a discriminatory impact when it comes to people who cannot afford to pay those fines. Now, under Richardson, I take it that you would agree that a state could pass a law disenfranchising a felon permanently. Is that right? Yes. But if I understand your argument right, if the state doesn't disenfranchise a felon permanently but says that the felon has to fill out its prison sentence and fulfill the monetary penalty, then that infringes on the Harper theory. Is that what you're saying? So he could be disenfranchised permanently, but he can't be disenfranchised if, in order to be eligible, he has to pay the restitution and fees. That is correct. And the other important thing about the Richardson case is that on the second issue, regarding the uniformity of California's enforcement of the law, the court remanded the case for that issue to determine whether there was such a lack of uniformity in California's enforcement of the felon disenfranchisement law to run a separate equal protection claim. So even in Richardson, the Supreme Court was careful to recognize that the equal protection clause still applies, even when it comes to felon disenfranchisement. And that's the purpose for which we also cite to Hunter v. Underwood, which was a case struck down under the equal protection clause. Although Hunter involved intentional discrimination, the court did at least announce that it's important to make sure that when enforcing a felon disenfranchisement case or, in this situation, a reenfranchisement law, that the parameters of the equal protection clause are satisfied. And in this case, they are not. I would also like to say that even under Harper, even if we rely upon Anderson and the decision in Burdick to say that with respect to the equal protection claim, the court should have applied a heightened standard of review. The first step would have been to look at the character and magnitude of the burden being imposed and then the interest that the state has put forward to justify the burden that's being imposed. The district court not only did not cite to Anderson or Burdick, but it didn't even apply those tests. Instead, it applied the rational basis test. And Anderson and Burdick say that even if heightened scrutiny doesn't apply, it never drops down to rational basis. The court should have evaluated it to see whether it was reasonable and non-discriminatory. I didn't really see why there would be any equal protection analysis for a felon under Richardson. Richardson seems to say a felon disenfranchisement, a felon who is disenfranchised, has no equal protection claim, that reading section one, section two together. So I wasn't even sure why you would even apply rational basis. Can you explain that to me? Well, again, rational basis doesn't apply. It should be looked under to see whether it is reasonable and non-discriminatory. But, again, for the reasons I stated earlier, Richardson doesn't reach that far. The question in Richardson, can a state deny someone the right to vote because they've been convicted of a crime? The answer is yes. It doesn't speak to what the equal protection claim would be if the state decided to erect a reenfranchisement scheme that violates the equal protection clause. It does not say that the qualifications a state erects when it comes to reenfranchisement are immune from constitutional attack. And, again, that's why we direct the court's attention to Hunter, because that case illustrates clearly that the equal protection clause does apply still when it comes to disenfranchisement. But you're not alleging that there's any intentional discrimination on the basis of race or indigency in this case, correct? No, we do not allege intentional discrimination, but we do allege that there is a form of invidious discrimination, the fact that the requirement has nothing to do with a person's ability to vote, and that, again, if we had been allowed to present evidence, we would have shown that the people who are the most affected, disparately and negatively impacted by this law are the people who can't afford to write a check for the total amount of their restitution. But you're not limiting the lawsuit to those who can't afford, and, in fact, you haven't made any allegations that any of your clients can't afford to pay in the complaint, as I read the complaint. You say can't or won't pay, haven't or it is not limited to people who can't afford it. To your first question, that is correct. We bring an as-applied as well as a facial challenge. To your second point, that is not correct, Your Honor. We do allege in Paragraph 3 of the amended complaint that our client's failure or inability to satisfy their obligations subjects them to an equal protection violation. And I would say that in Paragraph 3 of the amended complaint, we allege that their failure or inability to satisfy their obligations. I have the amended complaint. Do you have it in front of you? But I would also like to say... No, no. Let's talk about this. I read Paragraph 3 and it keeps referring to failure or inability to pay. That is correct. And in Ashcroft v. Iqbal, the Supreme Court said that when determining whether Rule 8 notice pleadings are satisfied, the court is to use not only its judicial experience, but also common sense. So coupling the inability, which we do allege, plus the fact that Mr. Coronado applied for restoration of his rights... This says, this is on behalf of people. They say, denying the right to vote based on one's failure or inability to pay. So you're making claims of both kinds. Where do you claim that these defendants, the people who are actually before us, can't? That would be what we would prove if we had been allowed to engage in this case. Well, you have to allege it in the complaint. If that's the basis of your claim, then you have to allege it in the complaint. You haven't had a chance to amend your complaint. It is an allegation that your clients can't afford to pay. Not a separate allegation to that extent. Is there an allegation included within another allegation? Is there an allegation? We believe that what we put forward in Paragraph 3 is sufficient under Rule 8 notice pleadings. And if we find that not sufficient allegation of that, then you don't have a claim that they can't pay. Well, we would maintain, again, based on that, coupled with the fact that Mr. Coronado applied for restoration and was denied because he couldn't pay. And then nine years later, the only way that he's trying to get his rights is by filing a lawsuit. You're saying that, but you're not a witness. Is there an allegation that he was denied because he can't pay? Other than Paragraph 3, no, there isn't. But I think that Harper says clearly it doesn't matter. The Supreme Court said— That's perfectly fine. If you want to say it doesn't matter, then your claim is not being willing to pay is itself a violation. That's a case we'll consider. I was just making sure as to whether or not, because you keep talking about inability to pay, whether your claim hinges on inability to pay, because if it does, we'd have to consider that situation, people who can't afford. But what I hear you saying is it doesn't matter. Not being willing to pay is just as much a violation as not being able to pay. That is correct. I mean, I just want to clarify that, obviously, Your Honor, we have a disagreement on opinion in terms of what is necessary under Rule 8. We acknowledge or state that we have satisfied Rule 8 with respect to the as-applied challenge, and even if the district court had allowed us to engage in limited discovery on that, we would have shown that Mr. Garza, for example, he was appointed— I don't understand your position because I've just asked you the question, and you have specifically said you're not limiting it to people who aren't able to pay. You think that even if everybody were able to pay, that is still illegal in your view. So that's a case we have to consider. So in a sense, inability to pay becomes sort of an atmosphere that really doesn't make any difference because you are really not resting on inability to pay. We are not only resting on that, but that is not my opinion in terms of the facial challenge. That is what Harper says. It says that whether the person— No, no, I'm not talking about your case. You are not resting your claim on inability to pay. Not completely. We are resting our claim, our case, on inability to pay, and we believe, again, that we have satisfied Rule 8 for purposes of getting us over that initial hump on the as-applied challenge. But even if this Court were to disagree with that, that Harper says it doesn't matter. It doesn't matter if you have the money in your pocket. It doesn't matter if you decide—that's not our client's situation, but it doesn't matter if you don't want to pay. And Harmony V. Forsenius also stands for that proposition. Thank you. Okay, Mr. Cosgrove. Yes, I want to thank the Court for allowing me to participate by telephone. Absolutely. You're coming through loud and clear. I assure you that my inability to come to Tempe is very legitimate. I'm not even leaving the house these days. We have no doubt on that score. But you have one issue, which is an important issue, obviously, but it's a much narrower issue than the other counts, and that has to do with other crimes language in the Fourteenth Amendment, right? Yes, that is absolutely correct. The meaning of the term other crime in Section 2 of the Fourteenth Amendment is the sole issue. Well, let us say that is a threshold issue in this case. Yes, of course. Although that part of it is simple, the case itself is far more complicated than the case you've just been listening to. Explain to me why, since the Fourteenth Amendment was passed long after the common law, I mean, I suppose the common law in a sense is still with us, but when we think about crimes of common law, we think of things like trespass on the case and all of that stuff that all these fine students are now learning about in law school. Why would the common law be the test? Why wouldn't it at the very least be felonies as known in 1865 or 1867? Because the same Congress that approved the Fourteenth Amendment also passed the Reconstruction Act, which limited disenfranchisement to common law felonies. Then the next two Congresses passed the Ten Enabling Acts that enabled the readmission of the ex-Confederate states into the Union. It's our contention that all of those acts referred to the same common law felonies. They were simply clarifying what was ambiguous in the language other crime in Section 2. Could I interject a question here? In reading the materials, I felt that there was a missing point that maybe you can fill in for me. Your basic point is that we should interpret Section 2's reference to other crimes as meaning felonies at common law. And although I saw that there was a line between the words other crimes to mean serious crimes, you had some definitions to that effect. And I also saw you had some definitions saying that the word felonies means felonies at common law. But I didn't see anything saying that other crime or that a crime was always a felony or was always a felony at common law. I didn't see any definition. It seemed like the briefing just skipped over that point. If I understand you, I would point out that we rely on Blackstone and other authorities which show that in the 19th century the popular meaning of crime was actually limited to felonies by which Blackstone and the other court, including the U.S. Supreme Court, meant felonies at common law. Well, I saw – where do you say that – what's the definition that says that a crime means a felony? Because it said there are felonies and misdemeanors or trespasses or major crimes or minor crimes, but I didn't see one that was defining crime to mean felony. That was the usage. In Blackstone, there are at least ten places where Blackstone refers to crimes and misdemeanors. And he says that the popular definition of crime excludes misdemeanors. It's limited to felonies. So a crime is a serious crime. It's not a misdemeanor or trespass. He says it's limited to felonies, and then he goes on to state that felonies mean felonies at common law which result in the forfeiture of lands or goods or both. In Bannon, the U.S. Supreme Court adopts Blackstone's reasoning. It says that the word felony – in this case, 1898, the word felony means felony at common law. And the Oregon Exclusion Act, which provided for a two-year sentence, was not a felony because it was not a felony at common law. And the Reagan case points out that there was no definition in the United States code or statutes of what a felony was. Therefore, the court adopted the meaning of the word felony at common law. And can you refer me in your brief where it says that crime means felony? The precise – I have to refer to the table of contents of my brief. It's on page 43. It says that – On page 43, in item H, it says when the 14th Amendment was adopted, the word crime was properly understood to mean felony. Well, that's your – that's your articulation. That's my heading, yes. Okay. And then when I go down to the quote, it just says, the general definition comprehends both crimes and misdemeanors, though in common use the word crimes is made to denote such offenses as are of a deeper and more atrocious dye. Are you quoting from Blackstone now? Yes. I'm looking at your brief. Doesn't it go on to state, well, smaller faults and omissions of less consequence are comprised under the gentler name of misdemeanor only? Correct. But it doesn't say it says crimes are of a deeper and more atrocious dye. No, you have to look at another section in Blackstone, which defines what a common law felony is and what a misdemeanor is. And we were talking about Section 5 in Blackstone. There is another section that I refer to in Blackstone that states that by misdemeanor is meant any offense which is not a felony of common law. Well, the place where I get stuck is why, at common law, if the 14th Amendment was passed in the latter part of the 19th century, why wouldn't it at the very least encompass the concept of felony as it existed at that time? Why are we stuck in—I mean, I understand if we're talking about the original Constitution or even the first ten amendments were passed more or less contemporaneously, you might say, well, we looked to the common law. But there was close to a century of development since then, 80 years of development afterwards. Why isn't that taken into account? Well, I would—Richardson itself says that the Reconstruction Enabling Acts are convincing evidence of the historical understanding of the 14th Amendment. You're cutting out on us. Can you still hear me now? No. No, we lost your— Hello? Yeah, you're back. Okay, I'm sorry. Okay, Richardson itself says that the Reconstruction Enabling Acts are convincing evidence of the historical understanding of the 14th Amendment. So, the Second Circuit interpreted Richardson in Baker v. Pataki to the effect that contemporary history supports a construction of the term other crime as equating to common law felonies. Thank you. But I still haven't really answered your question. I think I have. The purposes, the important thing are the purposes that were intended to be accomplished. Mr. Cosgrove? Yes. I think we'll hear from opposing counsel now. Thank you. Okay. Your Honor, if I'm not going to have any more time in this, I feel, with all due respect, I feel deeply deprived because this is a complicated matter and cannot be—we've just barely scratched the surface, and I really haven't even had a chance to answer your question. You've had twice the time we allowed it to you. You're now going on to 12 minutes. Thank you very much. Thank you, Your Honor. Okay. Counsel? Good morning, Your Honors. May it please the Court, my name is Tim Nelson. I'm Chief Deputy Attorney General for the State of Arizona. With me today at counsel table is Barb Bailey from the Office of the Solicitor General and Dan Jerkowitz from the Pima County Attorney's Office. Are you going to be splitting time or are you— No, I will handle the totality. Okay. Go right ahead. Thank you. Your Honors, the question before the Court is whether the district courts below erred in dismissing the complaints and upholding Arizona's 97-year-old laws. Can I ask you a question before you get into the body of your argument? Sure. There are state law claims here. Yes, Your Honor. Are you taking—we're getting feedback here. Are you taking the position that those are barred by Pennhurst and the Eleventh Amendment? Is the state asserting the Eleventh Amendment privilege on the state law claims? We have not asserted the Eleventh Amendment on the state law. Are you doing it now? We—candidly, Your Honor, I don't think that we've briefed that particular issue, but I think that— It's your call. If you don't assert it, you lose it. Okay. Very well. That is entirely up to you standing there. Well, without the absence of briefing on it, I feel ill-equipped to assert it right now. Okay. But I think that the issue is that regardless, this doesn't violate the Arizona Constitution as well. That's fine, but you're not asserting any Eleventh Amendment privilege. That's correct. Okay. So the question then is whether our 97-year-old felon disenfranchisement scheme is constitutional in light of the Supreme Court's holding in Richardson's that states may permanently disenfranchise felons. We believe that Arizona's laws are sound because, one, felons have no fundamental right to vote. That distinguishes this case from the Harper case. What do you make of Farrakhan? I think Farrakhan is— I mean, we held in Farrakhan wrongly, I think, but we nevertheless held it that it is a condition that denying felons the right to vote, and to begin with, could be a violation of the Voting Rights Act. Well, Your Honor, first of all, Farrakhan was a voting rights amendment case. This is not a voting rights amendment case. And so it's just not applicable to the claims here. Talk into the mic. Yes, certainly, Your Honor. Even in Farrakhan, Your Honor, the majority acknowledged that plaintiffs must prove that the challenged voter qualification denies or abridges their right to vote on account of race. And here there are no such allegations. So this is simply not a Farrakhan case. This is not a race case. This is not a Voting Rights Act case. That's correct. Okay. And, of course, Your Honor's dissent in Farrakhan, I think, was the more compelling reasoning with regard to that. I thought so. All right. Felons have no fundamental right to vote. And, in fact, the 14th Amendment expressly permits their disenfranchisement. Arizona's disenfranchisement scheme is rationally related to the State's interests in deterring crime, protecting the rights of victims, which is extremely important in the State of Arizona, where we actually have a victims' rights provisions within our Constitution. We also have an interest in rehabilitating felons and in preserving election integrity. What do you make of the argument that the 14th Amendment only allows this as to common law felonies? I think that that is an argument that misreads. It misreads the plain language of the 14th Amendment, and it also is underscored by and contradicted by the Court's rulings in Richardson and in the more recent rulings by the courts in Madison and in the California case that was just decided, Boves. And I think that there's just simply no – Can the State deny the right to vote for jaywalking? Your Honor, at the – Or overdue library books? What the courts have held is that it is the legislature's province to decide which – I understand. That's why we have hypotheticals. Sure. I am supposing that the legislature said any crime, including a traffic, you know, speeding or jaywalking or whatever, if you commit one of those, you can't vote, period. I think, Your Honor, that if that were – Could it do that? It could if it didn't do so within a discriminatory intent. As long as we're outside of the realm of the Hunter case, where the State of Alabama had specifically looked for activities that they believed – that African Americans that they believed were more likely to commit, and therefore the intent of their disenfranchisement provision was to discriminate, as long as we're outside of that, then, yes, the State could – the legislature could decide that any offense is serious enough to warrant the disenfranchisement. There's no case holding that, though, right? Is there any case that has addressed what you might say is a petty crime or a petty offense? No. And, again, that's not our situation here. And that's not your case. That's not our case. That's right. Arizona's law applies specifically to felons, and the definition of a felony is a crime so serious that it's subject to imprisonment in the State penitentiary as opposed to a county jail. Well, it may not be your case. It's nevertheless interesting because we need to know what the limits are of the 14th Amendment's authorization because if it falls outside – you agree with me that if it falls outside of the authorization, it is illegal because the 14th Amendment says there will be no limitation of voting except as we allow here, right? Correct. I think that – And so we have to have some idea of what the scope of the authorization is. And, you know, you're – maybe this is not a petty crimes case, but your opposing counsel is saying the authorization is limited to certain kinds of felonies, those things that were felonies of common law. So drawing the line really is an issue here. And I think, Your Honor, that's why we have to go back to the plain language of the Constitution, which says other crimes, and that as defined as other crimes, it could apply to any crime that the legislature determines is sufficiently severe. Including petty crimes, in your view? Including petty crimes. In fact, Your Honor, if you look – Isn't that one of those self-disauthenticating interpretations? Because if you read other crimes as being that broad, it's just too broad. There has to be some other limiting principle there. Actually, Your Honor, I would disagree. If you look to the actual language of some of the state statutes that existed at the time the 14th Amendment came in, they specifically allowed disenfranchisement even for misdemeanors. And we cite to a number of those in our brief, including the Kentucky statute. And then – so it clearly – I am sure that pleasing Kentucky was number one on Congress's mind in 1865. But, Your Honor, the – I mean, doesn't it actually prove the opposite point? Isn't this exactly the kind of state law that the 14th Amendment was meant to extirpate? I think not, Your Honor, because, in fact, what happened –  I don't know. Maybe a little more persuasive. Well, New York, you know, one of the states that won the war. But, actually, Your Honor, even the southern states that were readmitted after the Reconstruction Act and after the 14th Amendment was enacted, a number of them allowed for the disenfranchisement on the basis of misdemeanors. And the Congress allowed them to be readmitted despite that fact. So, if anything, the history of what happened – Well, maybe they thought that the courts would take care of it. Since they had a prohibition in the 14th Amendment, you know, they thought we will admit them in. But, of course, we will not allow them to have these laws, which we think are an improper limit to the right to vote. Your Honor, we could speculate that that was their intent. There's been no evidence in the record at all that that was their intent. But you stand firm on the idea that other crimes means whatever the legislature means by other crimes. And that can include petty crimes. It can include misdemeanors. It can include infractions. If the legislature thinks that's a basis for denying, voting on the 14th Amendment says it's okay. With the caveat that it can't be done with a discriminatory intent, then, yes, that is what I believe. But, again, that's not our case. Our case is a case dealing with felonies in Arizona. And there's no question that the Arizona statute is consistent with what the vast majority of other states have done in terms of disenfranchising felons as opposed to misdemeanors. Now, what about the argument on the payment of restitution? Are you going to address that as well? I would be happy to, Your Honor. Thank you. Your Honor, what the Bynum case talked about was that there is fundamentally a social compact that exists between citizens and their society. And that when a person commits a felony, he falls into sort of a deficit situation. He needs to restore himself to the equilibrium of citizens who are complying with the laws before that person can be re-enfranchised. But in this context, it sounds a little like a poll tax if you have to pay the money to get the right to vote. Actually, Your Honor, I think it's very different, and let me explain why. Okay. What the punishment theory does is it requires incarceration, and sometimes it requires the payment of a fine or restitution. But those things are things that the defendant, the felon owes to society to pay his debt for having committed the crime. And whether it be a term of imprisonment or the payment of a fine that has caused harm to the state, these are things that every felon must do in order to get themselves back to the point where they could become eligible for voting under the re-enfranchisement portion of Arizona's law. And paying victim restitution is a particularly important state interest here in Arizona. As I mentioned, we have a victim's rights portion of our Constitution. We have victim's rights laws. We have a victim's bill of rights. All of these things suggest that in Arizona we care very greatly about making sure that victims are paid back before a felon can have the right to vote. But you make the same argument about the fine as you do for restitution, do you not? Yes, Your Honor, because the victim himself or herself is not the only person that's been offended by criminal conduct. Society as a whole has been harmed by criminal conduct. There's a loss in a feeling of security. There is a lack of respect for our laws. There are consequences that the state must incur in terms of prosecution, in terms of probation, in terms of incarceration. All of these things have costs, and it is appropriate to require a felon to bring himself up to par, to bring himself even so that he is on par with other citizens before we are going to reinstate the right to vote. Let's say that appellants did bring their argument that their clients were indigent, and so this law falls unequally on the indigent. Does that make it more like a Harper-type situation? No, Your Honor, I don't think so. And here's a couple of distinctions. First of all, the indigency isn't really the issue. Bernie Madoff is facing billions of dollars in restitution. He's a very wealthy guy, but he's never going to be able to pay the billions of dollars in restitution that he's going to need before he has brought himself back up to par on this sort of social balance. You don't know what he's got. Nobody does. But the point is it applies to all felons equally. You must make good on the court order. When the judge sentences you, the judge has that discretion. But you do see a difference between not following a court order because you choose not to and not following a court order because you can't. You couldn't, for example, enforce this with contempt, the payment of the restitution, although you might be able to do it against somebody who has the money and chooses not to come up with it, but you certainly couldn't put somebody in jail for civil contempt for failure to come up with money he doesn't have. I agree with that, Your Honor, but I think that if you start to follow this line, you could go too far. And let me give you an example. If we were to say that an elderly person is unable to complete the terms of their sentence because of their age, then you start running into – if you were to recognize that, the type of cause of action that you're suggesting, then you have to – I'm sorry. You mean that they die before they – what do you mean not able to complete the sentence? I'm sorry? I'm not sure what you mean by unable to complete the sentence. Well, so for an example, if a 20-year-old commits a crime for which the mandatory minimum sentence is 20 years and a 90-year-old commits the same crime, the 90-year-old may be unable to complete the term of that sentence in the course of their lifetime. It would not be inappropriate to deny the 90-year-old the right to vote despite the fact that – After they die in prison? I'm having a hard time following your hypothetical. The hypothetical deals with the inability to complete the sentence. The inability to complete the sentence is not – cannot be a basis for determining whether the right of reenfranchisement should occur. That's the point. That must be the worst hypothetical I've heard. Really? All right. In 20 years. All right. Could you briefly address the privileges and immunities clause arguments? I think you said, well, it's like the equal protection clause, and so analyze it the same way. But I was just wondering, I wasn't even sure whether the right to vote is a privilege or immunity of national citizenship. And so how do we analyze the privileges and immunities claim? I think, first of all, you have to apply it with regard to whether you're talking about citizens who have not committed felonies and citizens who have. But we don't have a Richardson that's analyzing privileges and immunities. So are you saying we should just analyze it the same way as Richardson analyzed the equal protection clause? Well, I think you should use the Richardson as your guidepost. I think what the Washington Supreme Court did in Madison is very similar here. And Washington's privileges and immunities clause is identically written to the Arizona privileges and immunities clause. And the Washington court in Madison concluded that its felon disenfranchisement scheme did not violate the privileges and immunities clause in Washington. And I think that reasoning is exactly applicable to Arizona's as well. And the United States, the Constitution, privileges and immunity clause? I mean, that's not written exactly the same way. So what would the analysis be for that? Well, I think the analysis is very similar. I mean, the question is, first, you have to look to whether people are similarly situated. And felons are not similarly situated to nonfelons. Felons owe a debt to society. Nonfelons don't. Nonfelons have a fundamental right to vote. So do you agree that the right to vote is a privilege or immunity of national citizenship? Do you agree with that, so that there is at least a claim there? Well, I believe that for nonfelons, the right to vote is a fundamental right, yes. But for felons, it's different. In fact, the 14th Amendment specifically says that states can disenfranchise felons who commit crimes. And that explicit language, taking felons out of the group of people who otherwise possess the fundamental right to vote, is the distinction. Okay, thank you. Thank you. I'd just like to follow up on a few points. The first is the state interest. Well, you are largely out of time. We'll give you a couple of minutes for rebuttal. Okay. Two minutes. Okay. Well, then I will focus on the interest that the state has put forward, and I will direct this Court's attention to Bearden v. Georgia. In that case, Georgia set forth and put forth the exact three same justifications that Arizona has put forth. The first one having to do with rehabilitation. And in that case, the Court recognized that just because a person can't afford to satisfy, I believe it was restitution in that case and probation was revoked, but just because a person cannot afford to satisfy a certain restitution doesn't mean that they're not rehabilitated. And I would also emphasize that in our case, it has been for Mr. Coronado almost two decades since he committed his first and only felony. In the case of Mr. Garza, it has also been almost 17 years since he committed his first. Well, it may be so, but if they, in fact, are able to satisfy the obligation and choose not to, I have little sympathy for them. Well, that leads me to my second point, which is to emphasize that we're not saying that restitution shouldn't be paid. It should be paid. They don't challenge their sentences, and if they could write a check for the whole amount of money, I'm sure Mr. Coronado would have, instead of trying to petition the State to get his rights restored and then coming before this Court. Has he made partial payments? Well, if we had been allowed to present evidence, we would have shown what efforts he has made to pay. We would have also shown that there are mechanisms already available to the State that the State is not availing itself of, such as garnishing any wages that might have been earned or putting lien on property. I see. So they were required to go after him and hound him for the money. No. Isn't part of restoring your rights as a citizen is owning up to your debt to society and paying the money when it's due without having to have the State come spend the money and the resources to come hounding you for it? That is correct, Your Honor, and also part of your responsibility is doing your best to stay crime-free after you've committed your crime and been punished, and Mr. Coronado, Mr. Garza, and Mr. Rubio have done that. They have not been convicted of any other crimes, but we just emphasize that there are other mechanisms available to show that this is not a necessary burden that the State must impose. It has other options. It's not taking advantage of those options, and yet, for unconstitutional purposes, is putting or erecting this barrier when it comes to the right to vote. Thank you very much for your time. Thank you very much. The case is argued and submitted. We are adjourned.
judges: O'connor, Kozinski, Ikuta